J-S30024-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO H.O.C. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.E.C. | : : : : : | |
| | : | No. 118 WDA 2020 |

Appeal from the Order Dated December 27, 2019
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  O.C.D. No. 124-2018

BEFORE:   MURRAY, J., McLAUGHLIN, J., and STEVENS, P.J.E.*

MEMORANDUM BY McLAUGHLIN, J.:                    FILED AUGUST 19, 2020

J.E.C. ("Father") appeals from the order terminating his parental rights to H.O.C. ("Child"). He argues that the trial court abused its discretion in granting Venango County Children, Youth and Family Services Agency's ("CYS") petition to terminate his parental rights. We affirm.

CYS filed a petition in September 2018, seeking to terminate Father's parental rights to H.O.C., alleging that Father's whereabouts were unknown. See Petition for Involuntary Termination of Parental Rights, filed 9/7/18 at ¶ 3. It alleged that Father's parental rights should be terminated under 23 Pa.C.S.A. § 2511(a)(1) and (2).

> 6. The said father, . . . , has by conduct continuing for a period of time in excess of six (6) months to the date hereof:

_____

* Former Justice specially assigned to the Superior Court.

a. Evidenced a settled purpose of relinquishing parental claim to his minor child, [H.O.C.], and/or has refused or failed to perform parental duties for and during the period of time aforesaid; and/or

b. By reason of the continued incapacity, neglected or refusal, has caused [H.O.C.] to be without essential parental care, care or subsistence necessary for her physical or mental well-being and the conditions and causes of such incapacity, neglect, or refusal, cannot or will not be remedied.

c. Continuously and repeatedly neglected the child, which have caused her to be without parental care, control or subsistence necessary for her physical or mental wellbeing; and the conditions and causes of such neglect or refusal to perform parental care cannot or will not be remedied.

Id. at ¶ 6.

At a hearing on the termination petition, a CYS supervisor overseeing Child's dependency case, Valerie Zitterbart, testified that child came into CYS's care in December 2016, at the age of 12. N.T., Involuntary Termination of Parental Rights Hearing, 8/15/19 at 15, 16. CYS became aware of Child initially due to Child having missed six days of school. Id. at 17. CYS sought an adjudication of dependency because Child's mother could not be found. Id. at 18. Zitterbart testified that when CYS took Child into custody, Child reported "that as far as she was aware that her father was deceased." Id.

Zitterbart said that the agency investigated whether father was in fact deceased, and Child's caseworker spoke to Child's half-sister, who is also Father's child. She told Child's caseworker that "[Father] moved to California three years prior and that from her understanding she believed that he had been deceased." Id. at 19. Child's half-sister said that the coroner's office told

her that "they had an individual who fit his description and his tattoos and that this individual could possibly have been him, so they could state to her that they presume that he is possibly deceased, however, they could not confirm." Id. at 20.

However, Zitterbart testified that CYS learned in December 2017 that Father had contacted child's foster family. Id. at 21. Child's caseworker "contacted the phone number that [Father] had called from and left a voice mail and requested a call back," but did not receive a return call. Id. Approximately four months later, in March 2018, Child received a text message from Father. Child's caseworker obtained the number from which the text came and again left a message requesting a call back. This time, Father called and "basically stated that I am [Child's] father. I know that the family has told you that I am deceased, however, I'm not." Id. at 22. He further explained that he was living in California and had last seen Child when she was three or five years old. Id. at 22, 23. Child received a letter from Father in June 2018 stating that Child should face her fears in meeting with Father. Id. at 113.[1]

Zitterbart testified that in May 2018, Father moved back to Pennsylvania. Id. at 28. She said that from the time of his first contact with the foster care parents in December 2017 until the termination hearing in August 2019, Father contacted the Agency or the foster parents a total of

_____

[1] The letter from Father to Child is not included in the certified record.

seven times. Id. at 34. Zitterbart also testified that by December 2017, the Agency had ceased efforts at reunification and did not resume them. See id. at 40.

Child's therapist, Michelle Hayman, testified that she saw Child between November 2017 and May 2019. She said that that "[Child] only wants to lash out at [Father]. She doesn't want to feel abandonment more than she's already experienced. Her focus is on why he's stepping up now when he had years to show and he didn't want to be in her life before." Id. at 9, 11. Child's foster mother, C.D., testified that Child has been in her care since December 2017 and that her plan was to adopt Child. Id. at 54.

Child, who was nearly 15 years old at the time of the hearing, also testified and said that she did not know that Father was her biological father until she found her birth certificate when she was 11 years old. Id. at 108. She explained that she did have an opportunity to speak with Father in December 2017, and Father told her that he had not been in her life because of his drug addiction and because her mother had not known where he was. Id. at 112, 114. Child also testified that Father's letter "really upset me and bothered me" and that he had misspelled her name. Id. at 110. She testified that Father's opinion in the letter that she should face her fears upset her "[b]ecause I'm not afraid of talking to him. I'm not afraid of being here. I just don't want to." Id. at 113. She said that she wanted Father's rights to be terminated so that she could be adopted. Id.

> Q [Counsel for Father]: What do you want to happen today?
>
> A [Child]: I want [Father's] rights to be terminated, and I don't want him to appeal it and then have to wait several more months to get adopted.
>
> Q: What is your goal regarding this permanency?
>
> A: To get adopted.
>
> Q: Is there anything else you would like the Court to consider today?
>
> A: Termination.

Id. Child also testified that she has lived with foster parents for two years. Id. at 107. She testified that she cared for them and acknowledged them as her "parents." Id.

Father testified that at the time of the hearing, the last time he had spoken to Child was in 2018, and prior to that was in 2012. Id. at 66. He said that Child had lived with him and Child's mother in South Carolina in 2011, when Child was about five and a half years old. Id. at 83. He stated that "while I was out of town working on a Thursday evening [Child's] mother . . . abducted her and brought her to Pennsylvania." Id. at 67. Father claimed that in South Carolina "the mother has first rights and because I didn't take advantage - - or take the opportunity to secure my rights in any way by getting assistance or anything like that there was nothing I could do about it at the time." Id. at 67. He explained that for the next four or five years, he tried to find Child and her mother.

> Q [Counsel for Father]: Were you able to maintain contact with [Mother]?

A [Father]: I tried to uh – throughout the course of several years, four or five years I came back up to Pennsylvania from South Carolina in 2014 or '15 and tried to track down [Child], her whereabouts, her mother whereabouts. When her mother was in a financial position where she can be in a different state at any time, Your Honor. She can be at a different county at any time, Your Honor.

Q: Did you have any success in trying to find her?

A: I had no success. And every time I would get anywhere close to her I would be an hour or 20 minutes late and she'd be gone somewhere else.

Id. at 67-68.

Father said he eventually moved to California "for a job opportunity and as a means to secure my ongoing [drug addiction] recovery[.]" Id. at 68. Father then testified that he was first informed that Child was in CYS's custody from a friend. Id. at 70. He said that the friend said "he wasn't sure exactly what was [going] on with my child. He knew her mother had been arrested on apparently some kind of charges and that [Child] was in temporary custody of the state and they were looking for housing for her." Id.

Father said that he then called Child's foster mother who said she did not know him. Id. at 71. Father testified that he then returned to Pennsylvania in May 2018, contacted CYS and explained that he now lived in Pennsylvania, he loved Child, he was her biological father, and "would very much appreciate some kind of assistance in being a mediator." Id. at 72, 85. He "spoke to different workers there probably six times in the last two years" and "went to their office at least three times." Id. at 72-73. In June 2018, he also attended

- 6 -

the Permanency Review Hearing and had the opportunity to write a letter to Child. Id. at 75.

Father also testified about his interactions with CYS. He maintained that CYS "pretty much conveyed to me, for lack of words, they felt I was a day late and a dollar short and that anything I had to contribute they weren't really interested in receiving." Id. at 73. He stated that CYS "felt that [Child's] maturity at 14 is mature enough – or 13 – was mature enough for her to make her own decisions." Id. He also said that it was his belief that [Child] had been told for years that he was deceased and had not received letters and gifts he allegedly sent her. See id. at 74.

> From my understanding as of last week when I got a chance my first overview of this whole case she's been lied to for a number of years. She has no idea that during them years she has been sent gifts. She has been sent letters. I've tried numerous times to speak to her mother. I mean, she's old enough and aware of the fact that she knew [Mother's boyfriend] was abusive to her mother. . . .

Id.

Following the hearing, the trial court terminated Father's parental rights. Findings of Facts and Conclusions of Law, filed 12/27/19 at 8. This timely appeal followed.

Father raises the following claims before this Court:

> I. Whether the trial court erred as a matter of law or abused its discretion in determining that [Father's] parental rights should be terminated as being in the best interest of the minor child was against the weight of the evidence presented because the evidence presented at trial established that once the Father was located and informed

of the dependency matter regarding the minor child, the father made every effort to return to Venango County, Pennsylvania, and parent the minor child?

II. Whether the trial court erred as a matter of law or abused its discretion in determining [Father's] parental rights should be terminated when failing to adequately consider the father's efforts to create contact and a relationship with the minor child and barriers set up by the Venango County Children, Youth and Family Services Agency to prevent father's attempt to create contact and a relationship with the minor child?

Father's Br. at 6.

In his first issue, Father maintains that CYS failed to carry its burden of proving by clear and convincing evidence that Father evidenced a settled purpose of relinquishing his parental rights. He alleges that "[f]rom December of 2017 until the filing of the Petition on September 7, 2018, [Father] took every step and made every request possible in this matter." Father's Br. at 17.

Section 2511 of the Adoption Act governs the termination of parental rights. Here, CYS sought termination of Father's rights pursuant to subsections 2511(a)(1) and (2).

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence

- 8 -

> necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A § 2511(a)(1), (2).

A party seeking termination of parental rights must plead and prove by clear and convincing evidence that termination is warranted under section 2511(a). See In re B.J.Z., 207 A.3d 914, 921 (Pa.Super. 2019). Clear and convincing evidence for purposes of terminating parental rights "is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re G.P.-R., 851 A.2d 967, 973 (Pa.Super. 2004) (quoting In re A.L.D., 797 A.2d 326, 336 (Pa.Super. 2002)). "[P]arental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties." In re Adoption of Charles E.D.M., II, 708 A.2d 88, 91 (Pa. 1998).

"Parental duty is best understood in relation to the needs of a child." In re C.M.S., 832 A.2d 457, 462 (Pa.Super. 2003) (citation omitted). The needs of a child include love, protection, guidance, and support. See id. "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." In re B.,N.M., 856 A.2d 847, 855 (Pa.Super. 2004).

In determining whether a parent has demonstrated a settled purpose of relinquishing parental claim to a child or failed to perform parental duties, the trial court must engage in a three part inquiry: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." Matter of Adoption of Charles E.D.M., II, 708 A.2d at 92.

When the trial court considers termination under subsection (a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). In terminating the rights of a parent the trial court must also give consideration to "the developmental, physical and emotional needs and welfare of the child" and determine if termination is warranted under Section 2511(b). Id. Upon appellate review, this Court need only agree with the trial court as to one of the subsections for termination under Section 2511(a), along with Section 2511(b). In Re B.J.Z., 207 A.3d at 922.

Here, the trial court found that CYS proved by clear and convincing evidence that termination of Father's rights were warranted under subsections 2511(a)(1) and (a)(2). Conclusions of Law at 7.

> This [c]ourt finds that for a period of at least (6) months immediately preceding the filing of the Petition that the father, . . . , has either evidenced a settled purpose of relinquishing his parental claim to this child or has refused or failed to perform parental duties as required

> in 23 Pa.C.S.A. § 2511(a)(1) and has evidenced a repeated and continued incapacity that has left the child without essential parental care, control or subsistence necessary for her physical and mental well-being as required by 23 Pa.C.S.A. § [2511](a)(2).

Id. at 7.

We agree that CYS met its burden under subsection 2511(a)(1). That subsection required CYS to show by clear and convincing evidence that during the six months before the filing of the termination petition, Father either demonstrated a settled purpose of relinquishing parental rights to Child or failed to perform parental duties. See In re Z.S.W., 946 A.2d 726, 730 (Pa.Super. 2008) (quoting In re Adoption of Charles E.D.M., 708 A.2d at 91).

Here, the evidence supports that Father failed to perform his parental duties, in that within the six month look-back period, from March 7, 2018 until September 7, 2018, Father failed to provide for the needs of Child. We acknowledge that Father has made efforts to develop a relationship with Child and has tried to contact Child. These efforts included texting Child; contacting CYS or the foster parents several times; making sure CYS knew that he was not dead as Child believed; writing a letter to Child; and moving back to Pennsylvania, where Child resides. However, these efforts by Father do not amount to actually performing his parental duties to provide for the physical and emotional needs of Child. See In re C.M.S., 832 A.2d at 462. Father maintained at the hearing that he searched for Child for four or five years after Child was allegedly abducted by Mother, but did not testify regarding any other

efforts he made between that time and the time of the termination petition. As the trial court concluded, "[Father] has had no contact with [Child], since she was the age of 5 . . . . Even after [Father] communicated with [Child] in December of 2017, [Father] did not take steps to immediately assume any parental role." Trial Ct. Op. at 6.

The evidence was also sufficient to establish, under subsection 2511(b), that "the developmental, physical and emotional needs and welfare of the child" would be best met by the termination of Father's rights. There is no meaningful parent-child bond between Father and Child. Child, who at the time of the termination hearing was nearly 15 years old, had not seen Father since the age of five. Additionally, Child did not know that Father was her biological Father until she was 11 years old. Child also believed that Father was deceased and when she finally learned that Father in fact was alive, she did not want to have a relationship with him. Child also expressed that it was her desire to have Father's rights terminated so that she could be adopted. The trial court did not abuse its discretion in concluding that CYS presented clear and convincing evidence to satisfy Section 2511.

Next, Father argues that the trial court "abused its discretion in determining that [Father's] parental rights should be terminated when failing to adequately consider the Father's efforts to create contact and a relationship with the minor child and the barriers set up by [CYS] to prevent Father's attempts to create contact and a relationship with [Child]?" Father's Br. at 6. This argument is similar to the one Father makes in support of his first issue,

in that he argues that his testimony showed that he made efforts to create a relationship with Child.

The certified record belies Father's claim that the trial court failed to adequately consider his efforts or CYS's alleged failure to help Father develop a relationship with Child. In its findings of facts the trial court listed every effort made by Father since the time of Child being placed in CYS's custody. These efforts included his first contact with Child's foster mom in December 2017; texting Child in March 2018; contacting CYS a total of three times between April and May 2018; and his attendance at the Permanency Review Hearing. Findings of Facts and Conclusions of Law at 2-4. The trial court also noted emails between CYS caseworkers showing a desire to have Child adopted and for Father to be out of Child's life. Id. at 2-3.

However, having recognized Father's efforts and CYS's position, the trial court nevertheless concluded that Father's actions during the six months preceding the filing of the petition did not undermine its conclusion that Father "failed to perform parental duties" for Child. In re Adoption of Charles E.D.M., II, 708 A.2d at 91. This was not error. As explained above, despite his efforts, Father has not provided for the needs of Child emotionally or physically. We thus affirm the order of the trial court terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/19/2020</u>